FILED
SUPERIOR COURT
OF GUAM

2021 AUG 26 PM 2:48

CLERK OF COURT

By:_____

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| **PEOPLE OF GUAM** | **CRIMINAL CASE NO.: CF0433-20** |
| vs. | **DECISION AND ORDER** |
| | Re: Defendant's Motion to Dismiss |
| **GIL TAITINGFONG SANTOS,** | |
| Defendant. | |

### INTRODUCTION

This matter came before the Honorable Judge Jonathan R. Quan on May 24, 2021, upon Gil Taitingfong Santos' (hereinafter "Defendant Santos") Motion to Dismiss. The People of Guam were represented by Assistant Attorney General Brendlynn O. Joseph. The Defendant was represented by Alternate Public Defender Peter J. Santos. After reviewing the moving papers and oral arguments of both parties, the Court **DENIES** the Defendant's Motion to Dismiss.

### BACKGROUND

On August 3, 2020, Guam Police Department Officer Burt Carbullido was patrolling in Sinajana, when he observed a motorcycle reverse into a red color bus stop. See Mot. to Dismiss at 2 (Apr. 26, 2021). Officer Carbullido parked his patrol vehicle and

CF0433-20, *People of Guam v. Gil Taitingfong Santos*
Decision and Order (Re: Defendant's Motion to Dismiss).
Page **1** of 9

approached a male individual who emerged from the bus stop, later identified as Defendant Santos. *Id.* After announcing his presence, Defendant Santos replied, "I'm just waiting for the rain to pass sir." *Id.* According to Officer Carbullido, it was not raining at the time. *Id.* Officer Carbullido asked Defendant Santos to produce his driver's license and motorcycle documents. *Id.* Defendant Santos explained that he only had a regular driver's license and the bike belonged to his son. *Id.* Defendant Santos further claimed he lived very close by. *Id.* Officer Carbullido noticed Defendant Santos "to have a bulge underneath his left armpit area with a fanny pack type clip exposed by his neck area." *Id.*

Defendant Santos became "very anxious" and began to be excited and angry. *Id.* Noting Defendant Santos' emotional state, Officer Carbullido requested an additional patrol unit for back up. *Id.* Defendant Santos then informed Officer Carbullido that he was currently on probation and verbally lashed out stating "you are a corrupted motherfucker officer Carbullido, why the fuck are you harassing me?" *Id.* at 3. Defendant Santos then suddenly "darted out of the bus stop. . . ." *Id.* Officer Carbullido gave pursuit on foot, while Defendant Santos "nearly collid[ed] with a customer" near the entrance of the Sinajana Payless. *Id.* Defendant Santos ran behind the store refrigeration container, and disappeared from sight. *Id.* Officer Carbullido became concerned Defendant Santos "was reaching for a weapon and waiting around the corner" for him. *Id.* After turning the corner, however, Officer Carbullido saw Defendant "running slower west" on Avenida Herman De Leon street. *Id.*

Officer Carbullido eventually caught up to the Defendant Santos and applied a takedown sweep. *Id.* Defendant Santos allegedly struggled against Officer Carbullido but was overpowered and placed in wrist restraints. *Id.* There appeared to be blood on the sidewalk while Defendant Santos was bleeding from the backside of his head, and in response, medics were requested. *Id.* While restrained:

> *"Officer Benavente inquired with the Defendant if he had any weapons on his person or his small black bag as Officer Benavente was going to conduct a pat down. The Defendant responded saying "go ahead and check, no weapons, I only have a baton". The Defendant then reached from inside the seam of his pants (right rear side) and pulled out a collapsible baton. In front of the Defendant, Officer Benavente then checked his small bag and found improvised glass pipe with white frost crystal like residue suspected to be methamphetamine."*

People's Opp'n to Mot. to Dismiss (May 11, 2021).

Defendant Santos filed the instant motion, seeking to dismiss the matter due to a violation of Defendant Santos' constitutional right to freedom against unreasonable searches and seizures, on April 26, 2021. The People filed their opposition on May 11, 2021. A hearing on the motion was held, via Zoom, on May 24, 2021, and the Court subsequently took this matter under advisement.

## **DISCUSSION**

The Fourth Amendment of the United States Constitution and the Guam Organic Act, Section 1421b(c), state: "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV; 48 U.S.C.A. § 1421b(c). The United States Supreme Court explains, "the rights of privacy and personal security protected by the Fourth Amendment . . . are to be regarded as of the very essence of constitutional liberty." *Harris v. U.S.*, 331 U.S. 145, 150 (1947). In interpreting the Fourth Amendment, "[t]he touchstone . . . is reasonableness . . . [and] [r]easonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (citations omitted). The Constitution, and by extension the Organic Act of Guam, "permits brief investigative detentions when a police officer has reasonable suspicion that an individual was engaged in or is about to be engaged in illegal conduct." *People v. Johnson*, 1997 Guam 9 ¶ 4 (citing *Terry v. Ohio*, 392 U .S. 1 (1968)). See also 8 GCA § 30.10[1]

"In order to determine whether an officer had reasonable suspicion sufficient to warrant a . . . stop, the court must look at the totality of the circumstances, adding into account the facts known to the officers from personal observation." *Johnson*, 1997 Guam 9 ¶ 6 (citation and quotation marks omitted). Furthermore, reasonable suspicion must exist at the time the stop was initiated. *Id*. The "lawfulness of a *Terry* stop turns not on the officer's actual state of mind at the time the challenged action was taken, but rather on an objective assessment of the officer 's actions. In other words, if sufficient objective evidence exists

---

[1] Guam's Stop and Frisk Act states: "[w]henever a peace officer encounters any person under circumstances which reasonably indicate that such person has committed, is committing or is about to commit a criminal offense, the peace officer may detain such person."

to demonstrate reasonable suspicion, a *Terry* stop is justified regardless of a police officer's subjective intent." *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008) (internal quotation marks and citations omitted).

**I. POLICE DID NOT ENGAGE IN A *TERRY* STOP BEFORE DEFENDANT FLED.**

"A *Terry* stop begins when an individual is seized for purposes of the Fourth Amendment." *United States v. Lopez*, 432 F. Supp. 3d 99, 110 (D. Conn. 2020) (*citing United States v. Price*, 599 F.2d 494, 498-99 (2nd Cir. 1979)). See also *United States v. Hernandez*, 847 F.3d 1257, 1264 (10th Cir. 2017) ("what may begin as a consensual encounter may change to an investigative detention if the police conduct changes and vice versa."). In addition, "a person is seized only when, by means of physical force or a show of authority, his freedom of movement is restrained . . . . As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy. . . ." *U.S. v. Mendenhall*, 466 U.S. 544, 553-54 (1980). Thus, "a person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 554. See also *Florida v. Boyd*, 501 U.S. 429, 434 (1991) ("a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required."). See also *People v. Chargualaf*, 2001 Guam 1 ¶ 21. Further, the inquiry into whether a reasonable person would have felt free to leave is highly fact specific, Courts have identified several factors to consider including:

> *[T]he time and place of the encounter, the number of officers present and whether they were uniformed, whether the police removed the person to a different location or isolated him or her from others, whether the person was informed that he or she was free to leave, whether the police indicated that the person was suspected of a crime, whether the police retained the person's documents, and whether the police exhibited threatening behavior or physical contact that would suggest to a reasonable person that he or she was not free to leave.*

*Ferris v. State*, 735 A.2d 491, 502 (Md. Ct. App. 1999); See also *United States v. McCarthur*, 6 F.3d 1270, 1275-76 (7th Cir. 1993); *United States v. Gray*, 883 F.3d 320, 322 (4th Cir. 1989).

Further, "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984) (citing *Florida v. Royer*, 460 U.S. 491, 501 (1983)). When an officer, however, does not return an identification card "a reasonable person is much less likely to believe he can simply terminate a police encounter." *U.S. v. Villa-Gonzalez*, 623 F.3d 526, 533 (8th Cir. 2010). Finally, a call for backup does not generally indicate a show of authority necessary to convert a consensual encounter into a *Terry* stop. See *U.S. v. Fields*, 823 F.3d 20, 29 (1st Cir. 2016). In *Fields*, an Officer requested backup during a consensual encounter after "becoming concerned with [defendant's] statements and seeming agitation" and therefore, the call for backup would not have "communicated to a reasonable person an attempt to capture of otherwise intrude upon [the defendant's] freedom of movement." *Id.* In other words, there are many reasons an officer will call for backup, including officer safety, that do not implicate a restriction on the ability to leave to a reasonable person. *Id.*

In the case at bar, Officer Carbullido approached Defendant Santos as he emerged from the bus stop in Sinajana where he had parked his motorcycle. Def.'s Mot. to Dismiss (Apr. 26, 2021). Defendant Santos informed Officer Carbullido that he "was waiting for the rain to pass. . . ." *Id.* According to Officer Carbullido, it was not raining. *Id.* Officer Carbullido then requested Defendant Santos' driver's license and motorcycle documents. *Id.* Defendant Santos claimed he "only had a regular driver's license." *Id.* Officer Carbullido then "noted Santos to have a bulge underneath his left armpit area with a fanny pack type clip exposed by his neck area." *Id.* Officer Carbullido then inquired whether Defendant Santos had anything on his person. *Id.* Defendant Santos responded "why are you harassing me officer, this is fucked up." *Id.* Officer Carbullido "noted Santos to be very anxious as he began to be excitedly angry," and then immediately requested for backup. *Id.* Defendant Santos angrily stated he is actively on probation and then "darted out of the bustop toward the Payless gravel parking lot." *Id.*

The totality of the circumstances indicates a consensual encounter. Officer Carbullido was alone. The encounter occurred in a public place. Officer Carbullido never

indicated Defendant Santos was a suspect to a crime or could not leave. The call for backup was because Defendant Santos was becoming agitated, not in an effort to restrict his freedom of movement. Further, simple requests for identification are not seizures. It should be noted that Officer Carbullido never received Defendant Santos' driver's license. Finally, there was no indication of threatening behavior or physical contact with Defendant Santos. Based on the totality of the circumstances, the encounter was entirely consensual until Defendant Santos took flight, because a reasonable person would feel free to leave.

## II. OFFICER CARBULLIDO HAD SUFFICIENT REASONABLE SUSPICION TO DETAIN DEFENDANT SANTOS AFTER HE TOOK FLIGHT.

A *Terry Stop* requires the Officer have "reasonable suspicion that an individual was engaged in or is about to be engaged in illegal activity." *Johnson*, 1997 Guam 9 ¶ 4. In order to determine whether an officer had reasonable suspicion . . . the court must look at the totality of the circumstances, taking into account the facts known to the officers from personal observation." *Id.* at ¶ 6. The reasonable suspicion must exist at the time the stop was initiated. *Id.* The "lawfulness of a Terry stop turns not on the officer's actual state of mind at the time the challenged action was taken, but rather on an objective assessment of the officer's actions. In other words, if sufficient objective evidence exists to demonstrate reasonable suspicion, a Terry stop is justified regardless of a police officer's subjective intent." *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008). Finally, "[b]rief, even if complete deprivations of a suspect's liberty do not convert a stop and frisk into an arrest so long as the methods of restraint used are reasonable to the circumstances." *U.S. v. Crittendon*, 883 F.2d 326, 329 (4th Cir. 1989). See also *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982).

In addition, "although flight, furtive gestures, nervousness, or startled behavior at the sight of a police officer, is, by itself, insufficient to justify an investigatory stop, this type of highly suspicious conduct may be a factor leading to a finding of reasonable [suspicion]." *State v. Handy*, 925 So. 2d 577, 581 (La. Ct. App. 2006). Likewise, "nervous evasive behavior is a pertinent factor in determining reasonable suspicion" and officers may use "commonsense judgments and inferences about human behavior. . . ." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). See also *United States v. Arvizu*, 534 U.S. 266, 274-75 (2000) (acts that, by themselves, might be innocent, can, when taken together, give rise to

reasonable suspicion). Finally, furtive movements coupled with an Officer's knowledge of the Defendant's prior criminal history, can establish reasonable suspicion. See *U.S. v. Horn*, 234 Fed. Appx. 466, 467 (9th Cir. 2007).

Defendant Santos argues that "[a]lthough, a police officer may chase a person who flees from them, it needs to be established that the incident occurred in a high crime area." Def.'s Mot. to Dismiss at 5 (Apr. 26, 2021). In other words, Defendant Santos is arguing that flight alone, absent evidence of flight occurring in a high crime area, does not supply reasonable suspicion. Defendant Santos is correct that unprovoked flight in a high crime area can supply reasonable suspicion. See *Wardlow*, 528 U.S. at 124. Flight alone, however, does not. See e.g. *State v. Mendez*, 970 P.2d 722, 730 (Wash. 1999).

In the present case, Officer Carbullido was not relying on flight alone to create reasonable suspicion. He noted Defendant Santos "to have a bulge underneath his left armpit with a fanny pack type clip exposed by his neck area." Def.'s Mot. to Dismiss at 2 (Apr. 26, 2021). He further noted Defendant Santos "to be very anxious as he began to be excitedly angry." *Id.* Further, Defendant Santos claimed he was waiting for the rain to pass while it was not raining, and told Officer Carbullido he was on probation. *Id.* It should also be noted that Officer Carbullido asked Defendant Santos to produce his driver's license and motorcycle documents. *Id.* Defendant Santos explained that he only had a regular driver's license and the bike belonged to his son. *Id.* Finally, Defendant Santos took flight. *Id.* Defendant Santos then took flight and then "nearly collid[ed] with a customer" near the entrance of the Sinajana Payless. *Id.*

While flight alone clearly does not establish reasonable suspicion, acts that may be innocent alone, can form reasonable suspicion when combined together. See *U.S. v. Horn*, 234 Fed. Appx. 466, 467 (9th Cir. 2007). In the present case, the Court finds ample evidence based upon the totality of the circumstances listed above that Officer Carbullido had reasonable suspicion to chase after Defendant Santos and then execute a *Terry* stop.

Finally, the *Terry* stop, was not a full seizure requiring probable cause because the use of wrist restraints was reasonable considering Defendant Santos "nearly collid[ed] with a customer," the bulge under Defendant Santos' left armpit and Officer Carbullido's "fear[]" Santos was reaching for a weapon." *Id.* See also *Crittendon*, 883 F.2d at 329. The Court, therefore, finds no Fourth Amendment violation as to the pursuit and subsequent *Terry* stop of Defendant Santos.

## III. OFFICERS LEGALLY LOCATED THE SUSPECTED AMPHETAMINE PURSUANT TO A CONSENT SEARCH

A *Terry* stop allows "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). A *Terry* stop "may include a pat-down of the suspect's effects, including a bag." *U.S. v. Leo*, 793 F.3d 742, 749 (7th Cir. 2015). See also *United States v. Muhammed*, 463 F.3d 115, 123-24 (2nd Cir. 2006). While a pat-down of a bag is generally allowed, however, the safety concerns that drive *Terry* stop policy do "not justify opening and emptying the backpack because [defendant] was handcuffed and out of reach of the backpack." *Leo*, 793 F.3d at 749.

In the instant case, at the time the bag was searched and the suspected amphetamines were located therein, Defendant Santos was in wrist restraints and the bag was no longer in his possession. It would be "inconceivable that [defendant] would have been able to lunge for the bag, unzip it, and grab the gun inside." *Id.* at 750. The search of the bag, thus, exceeded the permissible scope of the *Terry* frisk, which is limited to the search for weapons which could be used to harm officers or other parties during the encounter.

However, "in the absence of a warrant, the police may lawfully conduct a search or seizure only if an exception to the warrant requirement applies. . . . [v]oluntary consent is a recognized exception to the warrant requirement." *People v. Chargualaf*, 2001 Guam 1 ¶ 14. See also *People v. Santos*, 1999 Guam 1 ¶ 33. Further, "[i]f consent is given during either a lawful encounter or a lawful detention, as opposed to an illegal seizure, the validity of the consent turns on whether it was given voluntarily." *Chargualaf* at ¶ 15. The factors in determining voluntariness include:

> *1) whether the defendant was detained and the length of time of the questioning; 2) whether the defendant was threatened or intimidated by the police; 3) whether the defendant relied on misrepresentations or promises made by the police; 4) whether the person was in custody or under arrest when the consent was given; 5) whether the person was in a public or a secluded place; and 6) whether the defendant objected to the search.*

*Id.* at ¶ 25.

In the present case, after Defendant Santos was lawfully stopped pursuant to *Terry*, Officer Benavente "inquired with the Defendant if he had any weapons on his person or in his small black bag . . . ." People's Opp'n to Mot. to Dismiss at 4 (May 11, 2021). Defendant Santos then responded "'go ahead and check, no weapons, I only have a baton.'" *Id.* Defendant Santos was detained when consent was given, but the questioning lasted for a short period of time. The Police made no misrepresentations or promises, and searched the bag in front of the Defendant Santos <u>after</u> he stated "'go ahead and check, no weapons, I only have a baton.'" The search occurred in a public place, and Defendant Santos did not object to the search.

Based on the totality of the circumstances, the Court finds the search of the bag, and the resulting fruits of that search, were lawfully obtained under the consent exception.

### CONCLUSION

For the reasons set forth above, the Court hereby **DENIES** the Defendant's Motion to Dismiss.

**SO ORDERED** this _30th_ day of _August 2021_.

_____
**THE HONORABLE JONATHAN R. QUAN**
Judge, *Pro Tempore*, Superior Court of Guam

**SERVICE VIA E-MAIL**
I acknowledge that an electronic copy of the original was e-mailed to:

_AG, APD_

Date: _8/24/21_ Time: _3:10_
_____
Deputy Clerk, Superior Court of Guam